Filed 4/4/23 P. v. Kic CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JENESSA KIC et al.,<br><br>    Defendants and Appellants. | H047226<br>(Santa Cruz County<br>Super. Ct. Nos. 16CR05592,<br>                    16CR05596) |

Defendants Jenessa Kic and Nino Martin Ruiz appeal following a jury trial in which Ruiz was convicted of first degree murder and Kic was convicted of second degree murder. Both were also convicted of conspiracy to commit murder and various firearm offenses. The trial court sentenced Ruiz to three years plus 50 years to life, and Kic to three years plus 25 years to life.

Kic contends the trial court erred by failing to give instructions on the lesser included offenses of involuntary manslaughter and conspiracy to commit assault with a firearm, limiting the voluntary intoxication instruction to Ruiz, giving a conspiracy instruction based on implied malice, and not staying the firearm sentence under Penal Code section 654.[1] She also claims cumulative error. In a supplemental brief, she argues that Senate Bill No. 567 (2020-2021 Reg. Sess.) (Senate Bill 567) (Stats. 2021, ch. 731, § 1.3) and Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1) (Assembly Bill 518) apply retroactively to her case and warrant remand for resentencing.

---

[1] Unspecified statutory references are to the Penal Code.

Ruiz argues that the trial court erred by allowing the prosecution to present evidence of his gang ties, evidence of his past possession of guns, and giving a conspiracy to commit murder instruction based on implied malice. He also argues that his sentences for conspiracy to commit murder and possession of a firearm by a felon should be stayed under section 654, and that the abstract of judgment does not reflect the oral pronouncement.

We conclude that, as to Kic, her conviction for conspiracy to commit murder must be reversed based on instructional error. However, we reject her other claims of instructional error and cumulative error. Because Kic will necessarily be resentenced, we do not address her sentencing claims. As for Ruiz, we find no merit to his substantive claims, but determine that Ruiz's abstract of judgment must be corrected to reflect the oral pronouncement at sentencing.[2] Therefore, we reverse the judgments and remand with instructions.

## I. Factual Background

### A. Prosecution Case

#### 1. Events leading up to killing

In August 2016, Ruiz met Kic and the two became friends and dated. Kic was a member of the homeless community.[3] Ruiz spent much of his time living on the streets, though he would also occasionally stay at his mother's house and use the shower. Ruiz had a history of drug use including methamphetamine and pills.

Cristobal Natividad worked as a security guard, often working late into the early morning. He met Kic while working security one night. Natividad developed a

---

[2] Ruiz designated a blanket joinder of Kic's issues without raising additional argument as to how those issues applied to his particular cases. To the extent we reject those issues as to Kic, we do so as well for Ruiz without additional elaboration.

[3] Consistent with the language in Ruiz's and Kic's briefs, we refer to unhoused persons as members of the homeless community.

friendship with Kic, which according to Natividad was platonic. At some point he asked Kic to move into his studio apartment. She agreed and brought her clothes and backpack. Natividad later met Ruiz after he came home one day and found him in the apartment.

Natividad owned a Glock 20 handgun and 10-millimeter ammunition, which he kept in an unlocked gun box in his apartment. He also kept a bulletproof vest in his apartment.

Joseph Shuemaker, the victim, was a member of the homeless community. He and his girlfriend, Jessica B.,[4] usually slept outside near Depot Park in Santa Cruz. Shuemaker and Jessica dated from between 2015 until his death in 2016. Shuemaker was protective of Jessica.

Ruiz first met Shuemaker and Jessica under a bridge by the beach. Ruiz offered them methamphetamine, which they all smoked together. At some point later, Ruiz approached Jessica at the park and asked if Jessica ever "needed anything" or if she "wanted to take a shower." Jessica responded by telling Ruiz she had a boyfriend. Shuemaker then arrived and asked Ruiz what he was doing. Ruiz responded, "nothing." Jessica then told Shuemaker, "he just asked me if I wanted to take a shower." Shuemaker then questioned Ruiz, "are you calling my girlfriend a liar."

Another source of conflict between Ruiz and Shuemaker concerned the territory over which each person could sell drugs. Ruiz often sold his drugs at a specific Taco Bell location, and also engaged other people to sell drugs for him. Ruiz maintained that the territory from the "Taco Bell out to Depot Park" would be "primarily the white race territory" because it was the most profitable, and that "the Mexicans" and "the blacks" each "had their neighborhood" where they could sell drugs. Shuemaker told Ruiz that "nobody was going to dictate" who sold drugs, or where or when they could sell drugs.

---

[4] To protect their privacy, we initially refer to witnesses by their first name and last initial and subsequently by their first name. (Cal. Rules of Court, rule 8.90(b)(10).)

3

There were "probably three or four" arguments between Shuemaker and Ruiz concerning this topic "that resulted in shoving matches, a couple of swings were thrown." During one such argument, Ruiz "pull[ed] a knife" during an argument before the altercation was broken up.

Maria G., who was a member of the homeless community, described one incident when Ruiz came to check on her and Shuemaker "came out of no where [*sic*] and chased him off with a knife and was yelling." Ruiz ran away. Maria also described an incident prior to Shuemaker's death when Ruiz spoke to her on the phone. Ruiz asked Maria to pick up some things he left somewhere. Then he asked Maria if Shuemaker was there and "said he was going to get a gun and kill him pretty much."

Ruiz had confrontations with other individuals concerning drug sales. According to Mark H., another member of the homeless community, Ruiz wanted his help to "move product" and tried to recruit Mark into "[s]elling dope" for him. After Mark refused, Ruiz "immediately" put "a large sheath knife" on the countertop and brandished it in a threatening manner. Mark got up and walked away. Mark was "[v]ery uneasy" about Ruiz, as he "felt like he was a threat and a loose cannon." Mark told police that Ruiz said that "he would stab" Shuemaker "and/or kill him . . . more than once" when they were together.

Mark also described an incident that took place on August 22, 2016, when he observed Shuemaker with two people. Ruiz yelled angrily at Shuemaker, "I'm going to cut you" or "I'm going to get you" in a threatening manner. Shuemaker, who seemed scared, ran over to Mark and frantically asked for a knife, which Mark provided. Shuemaker went back towards Ruiz and the two shoved each other and shouted. Ruiz said, "I'm going to get you," and Shuemaker responded, "come on [and] bring it." Then the confrontation "just kind of ended and [Ruiz] took off."

Kic also had confrontations with Jessica. According to Angelic G., another member of the homeless community, Jessica, and another person "would basically punk

4

[Kic] and beat her up" because Jessica "didn't like" Kic. Kic had a "strong dislike" for Jessica "because she always got beat up by Jessica any time [she] basically saw her."

Sara C. was a friend of Shuemaker's and had known him since about 2009. She also knew Ruiz and had first met him a few months before August 2016. Sara recalled about a month prior to August 2016, Ruiz came into the Taco Bell "like hyped up, mad and stuff," and was "saying that he was going to shoot [Shuemaker], he was going to get a gun and shoot him." Sara asked why, and Ruiz replied that they had been fighting. Sara "proceeded to talk him out of it, saying . . . think about your kids . . . , do you really want them to visit you in jail?" Sara also testified that Ruiz claimed to be "part of a gang, or affiliated with it," but that this was disputed "because people from that [gang] said no." Ruiz variously claimed to be "an east sider" and "a skinhead."

Francisco V. testified that he was friends with Shuemaker and had known him for a few years.[5] They saw each other daily and sometimes used drugs together. Francisco had known Ruiz "[n]ot long." He recalled initially meeting Ruiz and "we kicked it off pretty good," but he quickly "started seeing his tendencies" and distanced himself from Ruiz. Francisco discussed a phone call between him and Ruiz. Ruiz called him sometime in July 2016, told him he had "had words with [Shuemaker] at Jamba Juice," and asked Francisco to "back him up" by bringing a knife or a gun. Francisco "didn't go."

Leo S., also a member of the homeless community, had known Shuemaker for a few months and Ruiz for a little longer.[6] Leo confirmed that Shuemaker and Ruiz did not get along, and that he had seen Shuemaker chase Ruiz "a couple times." On one

---

[5] Francisco was unavailable to testify at trial and his preliminary hearing testimony was read to the jury.

[6] Leo was also unavailable to testify at trial, and his preliminary hearing testimony was read to the jury and admitted into evidence.

occasion, Leo was driving a vehicle when Ruiz got into the vehicle and was carrying a firearm, which upset Leo because he was not supposed to be around any firearms.

Angelic had been friends with Kic for about eight months before the shooting. Kic allowed Angelic and Michael F., her boyfriend, to spend time and shower at Natividad's apartment. Angelic testified that days before Shuemaker was killed, Kic told her that she wanted to be there when Shuemaker begged for his life.

### 2. *Shuemaker's killing*

Between midnight and 1:00 a.m. on August 23, 2016, Angelic, Michael, and Kic were at Natividad's apartment. Using Angelic's phone, Kic sent Ruiz a text message asking him to get her some heroin because she was physically ill. Ruiz came to the apartment with heroin and Kic injected it. Kic, Ruiz, Angelic, and Michael then walked to Denny's and ate food. Once done, the group walked back to Angelic and Michael's tent. As they were walking, Shuemaker arrived on his bicycle and said something. Michael could not hear what he said, and asked Shuemaker to repeat it. Shuemaker stopped his bike and got off, throwing it to the ground. Speaking toward Ruiz, Shuemaker said "something about next time I see you, you better have a gun." Shuemaker also told Michael to "better watch who you hang out with," which Michael took to mean "stay away" from Ruiz. Shuemaker got on his bike and left. Ruiz ran away, though Michael recalled he did not look scared. Shuemaker then turned to follow Ruiz.

Kic, Angelic, and Michael walked some more until at some point Kic left and headed in the direction Ruiz and Shuemaker had gone. Angelic and Michael continued together to a gas station to buy lottery tickets, and stayed there between 30 minutes to two hours.

Sometime between 2:00 a.m. and 3:00 a.m., Natividad returned to his apartment from work and went to sleep. Although Natividad made prior statements about having seen Kic or Ruiz at the apartment, at trial he testified he saw no one there. At around that

6

same time, Leo was riding his bicycle near Natividad's apartment when he saw Ruiz and Kic outside the apartment.

At approximately 5:00 a.m., Natividad awoke after Kic slammed the door. Natividad was angry and the two argued. Kic told him she was going to Denny's. Natividad went to Denny's to find her but did not see her and went home.

At around 5:20 a.m., Kic sent a text message to Angelic, "went to get gun." At 5:32 a.m., Kic called Ruiz. At 5:33 a.m., after the phone call, Kic texted Ruiz, "your [boy] just threatened to throw me off my bike because he says [it is] his." She then added, "and he is standing here all bandanaed out, not letting me move." A minute later, she texted Ruiz again, "I either give out him or he is going to force me to." After a brief phone call at 5:34 a.m., Kic then texted Ruiz, "I know his bitch and dog were behind Wheel Works . . . before I call you he was there." At 5:44 a.m., Kic texted, "Success. On my way." All these messages were deleted from the phone but later recovered.

Angelic and Michael, who had been at the 76 gas station, left and headed back to their tent. On the way, they ran into Kic, who was riding her bicycle, and the three walked back to the tent. Ruiz called Kic's phone and asked to speak to Michael. Ruiz and Michael talked for about five minutes. Ruiz asked Michael to meet him at the water treatment plant and said that he "had gotten the gun for Joey"[7] "[t]o shoot him." Michael declined to meet him.

On the way to the tent, Kic was speaking to someone on the phone. Michael heard her tell someone, " 'call me when you get [there] and I'll come get you.' " At 6:06 a.m., Kic, Michael, and Angelic crossed a road near the tent. At 6:07 a.m., Ruiz texted Kic, writing, " 'be there soon.' " Five minutes later, Ruiz texted Kic, writing " 'success. On my way.' " These messages were deleted but later recovered.

---

[7] Many witnesses referred to Shuemaker as "Joey."

At 6:22 a.m., Ruiz texted Kic, writing, " 'I'm on the tracks.' " Kic left the tent and returned with Ruiz, who was wearing a bulletproof vest. Ruiz removed a gun from a holster on his right hip. At some point, Ruiz related that "he was going to shoot [Shuemaker]" with the gun. Kic stated that Shuemaker "sometimes slept behind Wheel Works," and that if they found Jessica they would be able to find Shuemaker. She said if they get ahold of Jessica, "it would bring [Shuemaker] out." Michael also recalled a discussion about if the gun were used, it could be tracked to Natividad because "there is a record of him having that weapon" and " 'he'd be brought up on charges.' " Consequently, there was a concern "[t]hat they all would be brought up on charges."

According to Michael, Ruiz said "he was going to freaking find [Shuemaker] and he was going to shoot him—that basically he was . . . done with the whole cat-and-mouse game with him." He said, " 'I'm going to find him and kill him.' " Kic responded, "you don't need to do all of that," and she suggested Ruiz "shoot him in the legs or something like that" because of "where the gun is coming from, you know what I mean."

At some point, Michael asked Ruiz if he could see the gun. Ruiz removed the clip and handed it to Michael, who noted it was a 10-millimeter semi-automatic pistol. After holding it for about two minutes, Michael handed it back to Ruiz.

Francisco returned to the camp site and saw Ruiz's bike parked next to a tent. Francisco and Ruiz met, and Francisco noticed Ruiz was carrying a gun and a bulletproof jacket. Francisco asked why he needed a gun. Kic responded that "[t]hey needed it for protection" without elaborating further. Francisco asked to see the gun, but Ruiz said no. According to Francisco, at some point, Ruiz carelessly waved the gun around, with the gun pointing at Francisco. Francisco was upset and told Ruiz, " 'Don't point that at me.' "

Sometime after sunrise, Leo saw Ruiz at the train trestle. Ruiz told Leo he was looking for Shuemaker, that he had something for him, and he wanted Shuemaker to call

him. Leo asked Ruiz if he planned to "have another knife fight with him," and Ruiz responded, "no, this time, I have a gun."

Rocky B., another member of the homeless community, had just woken up when Shuemaker arrived on his bicycle and stopped to talk. Rocky then saw Ruiz run up a nearby ramp. Rocky and Shuemaker were talking when Ruiz approached. When Ruiz was 75 to 100 feet away, Shuemaker looked over to Ruiz in surprise. Shuemaker put his bicycle down, walked about 10 feet toward Ruiz, and said to Ruiz, "do you want to come back for some more" and "what are you going to do with that thing?" Ruiz pulled a gun out of his pocket, bent his knee, and assumed "an aiming stance," and then fired the gun. Rocky heard a "pop," saw a "cloud of smoke," and saw Shuemaker fall to the ground.

Mark, who was nearby, also witnessed the shooting. He recalled that Shuemaker came by on his skateboard. Shuemaker kicked the tail of his board up, grabbed it, and he acknowledged Mark's presence. From about 50 to 75 feet away, Mark saw Ruiz run up from an access ramp before "instantly" taking a target shooting stance and pulling out a gun. Shuemaker dropped his skateboard, put his hands in the air, and said "bring it," while also calling Ruiz a "bitch" and asking, "what are you going to bring that" after realizing Ruiz had a gun. Ruiz shot Shuemaker and ran away.

At around 8:20 a.m., a maintenance worker heard the shots and called the police. Shuemaker was pronounced dead shortly after paramedics arrived.

At some point after 8:00 a.m., Kic returned to Natividad's apartment. At 8:17 a.m., Kic texted Ruiz, " 'Roommate here, too. Won't leave until he has gun back . . . I just acted like I didn't talk to you . . . . So you can decide. He has doctor appointment [at] 9:00."

Kic asked Natividad if he wanted to go to Capitola for breakfast. Natividad agreed, and Kic said she wanted to pick up a friend. They left and eventually picked up Ruiz.

9

Ruiz said he needed to pick up some money for breakfast. They first went to one mobile home park before going to another mobile home park. Ruiz's mother, Betty, worked at the second mobile home park.

Just before 10:00 a.m., a restaurant worker saw Kic and Ruiz sitting on a bench in Capitola. Kic, Ruiz, and Natividad were also seen on surveillance video in the same area at 9:48 a.m. and then again at 10:02 a.m. While there, Kic asked Natividad to take a picture of her and Ruiz on the sea wall. At 10:07 a.m., Ruiz posted the picture to Facebook with the notation, " 'What a great night and morning . . . at the beach chilling.' " At 10:13 a.m., Kic texted Ruiz, writing, " 'Need to shower. Get residue off.' "

At around 11:20 a.m., after receiving a tip from a witness, an officer watching Natividad's apartment saw Natividad, Kic, and Ruiz arrive in Natividad's truck and walk towards the apartment. Other officers arrived to assist. Natividad came out of the apartment first and was arrested. Kic and Ruiz eventually came out and were also arrested.

At the police station, Detectives Damon Williams and David Pawlak interviewed Ruiz. According to Williams, throughout the questioning, Ruiz's responses were "fast . . . and consistent," and his demeanor appeared to be "fine." He did not appear to be under the influence of a controlled substance or inebriated. Portions of the interview were played to the jury. Ruiz denied seeing Shuemaker at all that day and claimed he had spent the night at a beach in Capitola with Kic. In his interview, Ruiz denied firing a gun, stating, "I did not fucking shoot no damn gun." He added, "I have not fucking fired a gun. Never have for one." Ruiz explained that he would "never fucking do that" because "I don't have enough balls to fucking ever do that."

A search of Natividad's apartment revealed a gun lock box. Inside were cleaning tools and a magazine for a 10-millimeter Glock, but no gun. In an interview with police,

Natividad claimed that the gun was there the last time he saw it, that it should be in the box, and that if it was not there it was stolen.

A day after the shooting, a man walking near the area of the shooting found a bullet on the ground. The man put the bullet in his mouth to see if there was blood on it, then put it in his pocket and later gave it to police.

On September 11, 2016, Ruiz's mother, Betty, and a family friend visited Ruiz in jail. When speaking with the family friend, Ruiz directly handed her a piece of paper, on which Ruiz had written that the gun was under Betty's porch. Undetected by Betty, the family friend told him to "get that out of here." When Ruiz started to put it in his pocket, she said, "no eat that." Ruiz also talked with Betty and the family friend together. He denied being involved in the shooting. Rather, he indicated that Natividad, "he's the one that did it."

In a recorded conversation, Ruiz asked Betty and the family friend to find Mark and Angelic, the two individuals who identified Ruiz at Shuemaker's killing, because Ruiz's lawyer told Ruiz "that is willing to go show up and talk." Ruiz also identified Leo, who had seen Ruiz outside Natividad's apartment. He stated, "I just need those people to be talked to, though. You know?" "Those people right there—if—if they're not around . . . then there's no witnesses." "Then we have nothing to worry about," Ruiz added.

The family friend later told Betty about what Ruiz had said about the gun. Upon returning to the mobile home park where Betty lived, the two spoke further, called the police, and directed them to where the gun was hidden. Police recovered a backpack/purse containing a holster and a Glock 10-millimeter semi-automatic pistol. The gun had a 10-round magazine, with eight rounds in the magazine and one in the chamber. Police attempted to match the bullet found near the shooting with bullets in the gun. However, while the bullet was determined to be of the same general type, a

11

.40-caliber 10-millimeter bullet, it was too badly damaged to determine whether it was fired from that gun.

In a later recorded conversation with the family friend, Ruiz talked about another case where a woman was involved in a man's overdose death but never charged with murder. He observed that "she wasn't thinking. She was high, too." Then he added, "Yeah. See, I was high. I was coming under the influence of . . . [¶] . . . methamphetamine, and I killed that guy <laughs>. So—so, I should get manslaughter, too. I should be walking out of here. They should—they should give me a chance." Finishing, he said, "They should let me go. I'm a good citizen."

Michael F. was in jail and housed in a unit next to Ruiz. Ruiz told Michael not to testify, and "said that something might happen" to Francisco and Leo if Michael went ahead and testified. Michael considered the statement a threat. Later, four men whom he did not know approached Michael and told him not to testify. "They said that if [he] testified then something could come of that."

### C. Defense Case

Ruiz testified that he shot Shuemaker in self-defense. His relationship with Shuemaker soured after he saw Jessica crying and offered her food or a place to take a shower. Shuemaker came by and Jessica said that Ruiz was "trying to get at me." Shuemaker hit Ruiz in the chest and took his bicycle. After that, it was a "daily ritual" for Shuemaker to "c[o]me after" Ruiz. During one such incident, Ruiz was standing outside a Taco Bell smoking a cigarette when Shuemaker came up, "said some words," and then hit Ruiz "with the . . . skateboard . . . on the side of [his] face." Ruiz was left with a knot on his head and was shaken up. Ruiz became so scared of Shuemaker that he tried to learn Shuemaker's schedule so that he could avoid him throughout the day.

Ruiz testified that on the night of August 22, 2016, he went to Denny's with Michael and Angelic. Kic joined them. After they finished, they were walking when Shuemaker came up to them on his bicycle. Shuemaker stopped and got off, yelled

12

something about a gun, and reached for his waistband. Ruiz left quickly on his bicycle. Shuemaker followed him. He eventually caught up to him, got off his bicycle, and pulled out a gun. Shuemaker said, "I have a fucking .45 right here for your bitch ass." Ruiz begged Shuemaker, "don't do this right here, please don't do this right here." Ruiz told Shuemaker that "they are calling the cops" and Shuemaker left, saying, "I'll be back for your bitch ass."

Kic showed up, and after Ruiz told her what happened, she told Ruiz "that she could get [him] a gun." Ruiz said he would "rather go home," but Kic said she was scared and asked Ruiz to stay with her. Ruiz agreed. They went to Natividad's apartment, where Kic told Natividad that Shuemaker was armed and threatening her and Ruiz. Kic asked about Natividad's gun. Natividad told her to grab the gun case and bring it. Kic did so, and Natividad put the magazine clip in the gun, and then instructed Kic to get the holster. She did so. Natividad then holstered the gun. With Natividad's permission, Kic then took the bulletproof vest and gave it to Ruiz. She also then gave Ruiz the gun, telling Ruiz to "make sure" he gets it back to Natividad.

Ruiz put on the vest, took the gun, and left with Kic. He then went to the water treatment plant to sell drugs. He sent a text message to Michael asking him to come meet him because he "didn't want to go down the tracks" alone. Michael declined to come. Kic, however, agreed to meet him. After meeting up, Kic and Ruiz return to Michael's and Angelic's tent where Ruiz and Michael smoked methamphetamine. At some point, Kic told Ruiz to pull out the gun and show it to Michael and Angelic. Ruiz said, "are you sure," and Kic said, "yeah." Ruiz unloaded the gun and handed it to Michael. After Michael looked at it, he handed it back to Ruiz.

Francisco arrived about 20 minutes later, and Ruiz and Francisco smoked more methamphetamine. Francisco saw the gun and asked to see it but Ruiz said no. According to Ruiz, Francisco was upset and asked why Ruiz brought a gun to his tent

13

area. Ruiz responded that he "needed it for protection [and] that [his] life was just threatened." Francisco did not agree that he needed a gun.

Ruiz and Kic eventually left together, but then Ruiz continued alone. Ruiz later decided to head back to Kic's apartment but then unexpectedly ran into Shuemaker. Ruiz was scared and got off his bicycle. Shuemaker got off his skateboard and "was in like a running stance" like he was about to run at Ruiz. Shuemaker had a black object that looked like a gun in his right hand. Shuemaker said to Ruiz, you "better have a gun." Ruiz pulled out his gun, and Shuemaker yelled, "what are you going to do with that little bitch ass BB gun." As he said that, he took a "few steps" toward Ruiz like he was about to run at him. Ruiz told Shuemaker, "don't move." Shuemaker continued and Ruiz fired a single shot. Ruiz thought Shuemaker was holding the same gun he had pulled on Ruiz before. Ruiz did not intend to kill Shuemaker. He said he was "scared" and "coming down off the drugs" and "could have . . . hit anybody that was there."

Ruiz initially threw away the gun in a trash can but at Natividad's request retrieved it. He then hid the gun under his mother's porch. He also went to Capitola and took a photograph in an attempt to create an alibi. Asked why he did not call police and tell them what happened, Ruiz said he "didn't know what to do." He "wasn't sure what was the right thing to do," he "was too scared," and was not "in the right state of mind." He had never had good interactions with police and did not trust them.

Ruiz also called character witnesses who testified to Shuemaker's history of violence. Jason H., who was then a member of the homeless community, observed "[d]aily" confrontations between Shuemaker and Ruiz in the months preceding August 2016. Shuemaker was physically and verbally violent with Ruiz, punching him and threatening him with a knife. Ruiz did not fight back when he was physically attacked or threatened with a knife. Shuemaker also fought Jason a few times, but he stopped after Jason "finally decided to fight back." Shuemaker was also often physically aggressive and violent with other people.

14

## II. Procedural Background

The Santa Cruz County District Attorney filed an information charging Ruiz with murder (count 1; § 187, subd. (a)), conspiracy to commit murder (count 2; § 182, subd. (a)(1)), possession of a firearm by a felon (count 3; § 29800, subd. (a)(1)), and possession of ammunition by a prohibited person (count 4; § 30305, subd. (a)(1)). With respect to counts 1 and 2, it was alleged that Ruiz personally used a firearm (§ 12022.5, subd. (a)) and that he personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (b)).

Kic was charged by information with murder (count 1; § 187, subd. (a)) and conspiracy to commit murder (count 2; § 182, subd. (a)(1)). It was also alleged as to both counts that Kic possessed a firearm (§ 12022, subd. (a)(1)) and that she furnished a firearm to another person for purposes of committing a felony (§ 12022.4).

After a joint trial, the jury found Ruiz guilty on all counts, finding the murder to be first degree murder, and found all of the allegations true. The jury found Kic not guilty of first degree murder, but guilty of second degree murder and conspiracy to commit murder, and found all of the allegations true.

The trial court sentenced Ruiz to state prison for an aggregate term of three years plus 50 years to life.[8] Kic was sentenced to state prison for a total term of three years plus 25 years to life, consisting of 25 years to life on count 2 (conspiracy to commit murder), with a consecutive three-year term for furnishing a firearm. The court imposed but stayed a one-year gun-use enhancement as well as a 15-year-to-life term for second degree murder.

Kic and Ruiz both timely appealed.

---

[8] Because Ruiz claims error with respect to how his sentence was calculated and recorded in the abstract, we will discuss his sentence in more detail below.

### III. Discussion

#### A. *Gang Evidence*

Ruiz argues that the trial court erred by allowing the prosecution to introduce evidence of Ruiz's claimed membership in the East Side Live Oak criminal street gang. In a supplemental brief, he argues that in addition to being an error of state law, the admission of gang evidence also violated his federal constitutional rights.

#### 1. *Background*

Prior to trial, Ruiz moved in limine to exclude all gang related evidence as more prejudicial than probative. While the prosecutor confirmed that she would not present a gang expert or evidence that the shooting was gang motivated, she intended to introduce evidence that Ruiz claimed to be a member of the "LOC Eastside Live Oak" street gang. The prosecutor argued that the evidence was relevant because defense expert witnesses stated in their reports that Ruiz was a "coward," that he "runs away," and because Ruiz made statements that "he is some shrinking violet." Defense counsel opposed any gang evidence as "not relevant to this case." The court stated its tentative ruling that if Ruiz's experts testified, the prosecution would be permitted to introduce the gang evidence in rebuttal but not as part of its case-in-chief.

During an Evidence Code section 402 hearing for one of the defense experts, the expert stated he was expecting "evidence to indicate that [Ruiz] had non-paranoid reality-based reasons to be fearful of the victim," and that Ruiz was "unusually fearful." At the end of the hearing, Ruiz's defense counsel indicated he would try to present evidence to lay the foundation for the expert to testify.

During the prosecution's questioning of Maria, the prosecutor asked, "Did Mr. Ruiz ever talk about any gangs?" Maria replied, "Yes." Defense counsel then objected, and a sidebar was held outside the presence of the jury. The prosecutor explained that Ruiz "ran around with a blue hankie," talked extensively about East Side Locs in his interview, had references to East Side and Live Oak tattooed on his body, and "they are

16

trying to portray him as some shrinking violet." The prosecutor contended that in reality "that's not how he portrayed himself at all." Defense counsel reiterated that "[t]his is not a gang case, not alleged, not charged," and therefore it was not relevant. The court overruled the objection and allowed the line of questioning.

The prosecutor then asked Maria about what Ruiz had said about gangs, and Maria responded that Ruiz said he was in a gang but she could not remember the name of the gang. On cross examination, Maria testified that the "gang stuff . . . didn't seem like it was real," and that she thought Ruiz was lying.

During the prosecutor's direct examination of Sara, Sara was asked, "Did Mr. Ruiz ever say he was a member of a gang?" Defense counsel objected on relevance grounds and the trial court overruled the objection. Sara then testified that Ruiz claimed he was an "east sider" and a "skinhead," but that these claims were disputed "because people from that said no." Asked on cross examination whether she believed Ruiz's claims, Sara said, "Not one bit." Sara was also asked by Ruiz's defense counsel if she had previously described Ruiz as a coward. Sara said yes.

During Jessica's cross examination, Ruiz's defense counsel asked whether Ruiz ever exaggerated to make himself look tougher than he was, and Jessica agreed. Jessica also agreed that when you live on the streets "[y]ou have to sort of make an image for yourself so that you won't get picked on by others."

During Mark's cross examination, Ruiz's defense counsel asked if Ruiz bragged a lot and "ma[d]e up stuff." Mark agreed, and further agreed Ruiz often made up stories and said things that Mark did not take seriously.

During Daniel K.'s testimony, the prosecutor asked Daniel, a member of the homeless community, whether he ever described Ruiz "as if he [was] frontin' as if he was some kind of a person." After Daniel asked the prosecutor to repeat the question, the prosecutor requested a sidebar. At sidebar, the prosecutor explained that Daniel had described Ruiz as "frontin' like he was a gang member," and that other people also said

17

Ruiz claimed gang membership. Defense counsel objected. The court stated, "It's my recollection that the Defense team has brought out [that] Mr. Ruiz claims to be an east sider, [but] that is exaggeration, bluff." Accordingly, the court determined each side would be allowed to ask about what Ruiz said, and the other side would be permitted to rebut it.

The prosecutor asked Daniel again whether Ruiz ever tried "to front like he was a gang member, do you remember . . . hearing him say that or describing him[self] that way?" Daniel replied, "Yes." Asked whether he believed Ruiz, Daniel responded, "No. No, I didn't believe that he was."

During Rocky's testimony, the prosecutor asked whether Ruiz had any tattoos. Rocky responded that he did, and explained in response to another question about what the tattoo depicted, "ESLO. East Side Live Oak."

The gang issue also arose during discussions of possible redactions to Leo's preliminary hearing testimony, which was going to be read to the jury. Defense counsel requested that the court redact the prosecutor's questions about Ruiz's claim of gang membership. The prosecutor responded that the statements were probative because Leo testified he knew Ruiz for only two or three months, meaning the statements were made around the time of Shuemaker's killing. The prosecutor also asked to introduce photographs of Ruiz's gang tattoos that he got while in custody and photographs of gang indicia in Ruiz's home. The court ultimately decided to exclude Leo's comments about gangs. The court noted that the testimony was not probative and was unduly prejudicial, and unlike other witnesses, included detailed discussions of gang life. As for the photographs, the court decided to not allow the gang tattoos to be introduced, and only allow one photograph of indicia of East Side. The court also allowed limited testimony related to the photograph, but no discussion that East Side was a white supremacist gang or about what they do.

18

Later, the detective who searched the home of Ruiz's mother discussed finding a drawing on the kitchen table with "Eastside S 831 C," which she explained was a Santa Cruz based street gang. A photograph of the drawing, which had Ruiz's name on it, was displayed to the jury.

Ruiz testified that he was not a member of the East Side Live Oak gang and that he associated with them for protection and to keep from being bullied. He testified that when he told people he was in the gang it was a lie, and he did it to make himself look "bigger and badder." Asked about his Live Oak tattoo on his face, Ruiz said it was not a gang tattoo and he only got the tattoo because it was "a town in Santa Cruz that I love."

Ruiz was asked about statements he made to police, in which he told detectives he was "a coward" who "didn't have the balls to shoot and kill [Shuemaker]." He acknowledged the statements. He later emphasized, "I'm a coward. I'm a chicken shit."

Testifying for the defense, Jason described Ruiz's demeanor as "[d]ocile" and explained that Ruiz never did anything when Shuemaker punched him. Jason also twice described Ruiz as "[a] docile person."

### 2. *Standard of Review*

Under Evidence Code section 1101, subdivision (a), "Except as [otherwise provided], evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Under Evidence Code section 1101, subdivision (b), "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . .) other than his or her disposition to commit such an act." Under Evidence Code section 1101, subdivision (c), "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

19

Thus, "as a general rule, [gang evidence] is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*).) The test of relevance is whether the evidence tends logically, naturally, and by reasonable inference to establish material facts such as identity, intent, or motive. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1058; Evid. Code, §§ 210, 1101, subd. (b).) However, "even if [gang] evidence is found to be relevant, the trial court must carefully scrutinize [such] evidence before admitting it because of its potentially inflammatory impact on the jury." (*Albarran*, at p. 224.) Under Evidence Code section 352, the trial court may, in its discretion, exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice.

The decision on whether gang evidence is relevant and not unduly prejudicial rests within the broad discretion of the trial court. (*Albarran*, *supra*, 149 Cal.App.4th at pp. 224-225.) We will not disturb a trial court's exercise of discretion " ' "except on a showing that the [trial] court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Id*. at p. 225, italics omitted.) The appellant bears the burden to demonstrate abuse of discretion and prejudice. (*Ibid*.)

### 3. *The trial court did not abuse its discretion by admitting limited evidence of Ruiz's claims of gang membership*

Ruiz asserts the admitted gang evidence was not relevant and was improper disposition evidence to show him as dangerous or violent. The Attorney General argues that the limited gang evidence was relevant to counter Ruiz's claims of cowardice and fear.

We conclude that the trial court reasonably determined that the gang evidence, which consisted largely of Ruiz's claims to gang membership, was relevant to rebut

20

Ruiz's asserted defense. His defense rested on a claim that he acted in self-defense and that he was in essence a coward who would not have planned Shuemaker's murder. Ruiz's defense counsel repeatedly elicited statements on cross examination that Ruiz was a coward, that he exaggerated to look tough, and that he "made up stuff." The evidence of Ruiz's statements that he was a member of or associated with gangs was relevant and could possibly undermine the truth of this claim. Therefore, the trial court properly allowed rebuttal evidence, based on his boasting of gang membership, that Ruiz was not in fact the coward he claimed to be and that the killing was not unintentional. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 31 [defendant's gang membership relevant to show intent to steal and kill].)

Moreover, the probative value of the gang evidence was not substantially outweighed by the risk of undue prejudice. " 'The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.' " (*People v. Montes* (2014) 58 Cal.4th 809, 859.) Under Evidence Code section 352, a court has the discretion to exclude otherwise admissible evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Here, the record reflects that the trial court carefully weighed the probative and prejudicial value of the gang evidence. Initially, the court tentatively excluded the gang evidence until it became clear that Ruiz's self-defense claim rested on the notion that he was passive and cowardly, whereas Shuemaker was violent and aggressive. But even in admitting the gang evidence, the court limited the nature and quantity of the evidence sought by the prosecution. Notably, the court excluded Leo's detailed testimony about gangs and gang culture, limited testimony on the activities of the East Side street gang, and limited photographs of Ruiz's gang tattoos. The testimony that was permitted was limited, short in duration, and not overly graphic. Nor was the evidence unduly

21

prejudicial. Indeed, some of the challenged testimony also included statements that the witness did not believe Ruiz's claims of gang membership. Combined with Ruiz's explanation that he only claimed claim membership as a means of protection, the evidence of Ruiz's gang membership was not particularly prejudicial.

In sum, the court's weighing of evidence did not exceed the bounds of reason and was not an abuse of discretion.

In addition, having found no state law error, we also reject Ruiz's federal constitutional claim. Ruiz's argument "fails to account for the general rule that the application of the ordinary rules of evidence under state law do not violate a criminal defendant's federal constitutional right to present a defense, because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial." (*People v. Abilez* (2007) 41 Cal.4th 472, 503; see also *People v. Fitch* (1997) 55 Cal.App.4th 172, 178-179 ["Preventing and dealing with crime is more the business of the states than of the federal government. Accordingly, the state has power to regulate the procedures under which its laws are carried out, and a rule of evidence in this regard 'is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' "].)

### B. Gun Evidence

Ruiz argues that the trial court erred by allowing testimony by two witnesses about Ruiz's possession of a gun in a vehicle in the weeks prior to the killing.

### 1. Background

Sara testified that sometime within the month prior to Shuemaker's death, she saw Ruiz in his car with a Glock handgun "sitting on . . . the center console" of the car. Ruiz was "hanging with the homies, trying to act cool, like he was a gangster." Sara thought it "looked fake."

Later, during discussions of redactions of Leo's preliminary hearing testimony, defense counsel asked the trial court to exclude portions in which Leo talked about Ruiz's possession of a gun on another occasion. Counsel argued that because the prosecution's theory was that Ruiz used Natividad's gun, the prosecution should not be allowed to show he possessed other guns. The prosecutor argued that while there was strong evidence the gun recovered was the murder weapon, there was no definitive evidence. Relying on *People v. Sanchez* (2019) 7 Cal.5th 14 (*Sanchez*), the court allowed the testimony.

Through his preliminary hearing testimony, the jury learned that on one occasion, Leo was driving a vehicle when Ruiz got into the vehicle and was carrying a firearm, which upset Leo because he was not supposed to be around any firearms.

At trial, Natividad was shown a picture of the Glock 20 that was recovered. He said he had "a gun similar to that" one pictured. He affirmed his earlier statement to police that his gun was stolen. With respect to the gun box, he admitted that although it was lockable, he chose not to lock it. On the morning of the killing, he did not recall "hearing anything" from the area of his closet where he kept the gun and he did not give Kic or Ruiz permission to take the gun.

### 2. *Standard of Review*

"When the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056.)

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised

23

its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

### 3. *Ruiz has not shown prejudicial error*

Initially, as to Ruiz's challenge to Sara's testimony, the Attorney General argues that because he never objected to her testimony in the trial court, this portion of the claim is forfeited on appeal. (*People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*).) We agree.

As to Ruiz's challenge to Leo's preliminary hearing statements about prior possession of a gun, we conclude that the court did not abuse its discretion in admitting the statements. *Sanchez, supra*, 7 Cal.5th at page 55, is instructive. In *Sanchez*, over the defendant's objection, the court admitted evidence that he possessed a firearm around the time of the murders. In concluding that there was no error, our high court reasoned that *Barnwell* did not apply: "Here, the murder weapon was never found, but the evidence showed it was likely a nine-millimeter firearm. The firearm the witnesses testified about could easily have been the one used in the murders." (*Ibid.*)

Here, like *Sanchez*, the murder weapon was never definitively confirmed and the weapons that Ruiz was seen holding could have been one used in the murders. Regarding the weapon found under the porch, the ballistics evidence was found to be inconclusive and Natividad continued to deny giving his gun to Ruiz. He maintained his gun had been stolen. Shown a picture of the gun recovered, Natividad only provided that it was "similar" to his gun. When the trial court allowed the prosecution to present evidence of Ruiz's prior possession of handguns, Ruiz had not yet testified to his version of events regarding how he obtained a gun. In sum, while there was strong reason to believe the weapon found under Ruiz's mother's porch and Natividad's gun were one and the same, and that it was also the murder weapon, that fact was not uncontested. Indeed, in one of his interviews with police, Ruiz initially denied having ever held a gun before. Evidence of his prior possession of a gun which could have been the murder weapon was

24

both relevant and probative.  Thus, the trial court did not abuse its discretion in admitting it.

Even assuming error here, we would not find prejudice.  "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional [*People v. Watson* (1956) 46 Cal.2d 818] test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error."  (*Partida*, *supra*, 37 Cal.4th at p. 439.)  Here, there was no reasonable probability of a different outcome because the evidence of Ruiz's guilt was considerable, and the gun evidence was comparatively inconsequential.  The evidence showed that Ruiz announced his intention to get a gun and shoot Shuemaker to multiple people on multiple occasions, that he retrieved a gun consistent with those intentions, and that he found Shuemaker, assumed a shooting stance, and shot him.  Two witnesses to the shooting, although varying in certain details, confirmed that the killing was without provocation.  In contrast, Leo's statements about seeing the gun weeks before the killing were fleeting and nonspecific.  Under these circumstances, there was no reasonable probability of a different outcome in the absence of error.

### 4. *There was no cumulative error with respect to the gang and gun evidence*

Ruiz argues that "[e]ven if neither of the errors in admitting the gang or gun evidence were individually sufficiently prejudicial, in combination they denied Ruiz a fair trial."  However, we have found no errors.  Because there are no other errors to cumulate, his claim of cumulative error necessarily fails. (*People v. Staten* (2000) 24 Cal.4th 434, 464.)

### C. *Instructional Error: Conspiracy to Commit Murder*

Ruiz contends that the trial court committed instructional error because the jury instructions improperly allowed the jury to convict him of conspiracy to commit murder based on a finding of implied malice.  He argues that the error was prejudicial and warrants reversal.  Kic similarly argues that the instruction was erroneous, and that it was

not harmless. The Attorney General concedes error but maintains it was harmless beyond a reasonable doubt. We conclude that there was error. As to Ruiz, we find the error harmless based on the jury's findings on the other charges. However, as to Kic, we conclude that the error was not harmless beyond a reasonable doubt, and we therefore reverse her conviction as to count 2, conspiracy to commit murder.

### 1. *Background*

The trial court instructed the jury with CALCRIM No. 520 (first or second degree murder with malice aforethought) and CALCRIM No. 563 (conspiracy to commit murder). CALCRIM No. 563 told the jury, in relevant part, "[t]o decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit murder, please refer to Instructions 500 and 520, which define that crime." It went on to say, "The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder." The instruction for CALCRIM No. 520, in turn, included the following description, "There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder." The instruction then went on to define the elements of implied malice.

### 2. *Standard of Review*

"We review a claim of instructional error de novo. [Citation.] 'Review of the adequacy of instructions is based on whether the trial court "fully and fairly instructed on the applicable law." ' " (*People v. Barber* (2020) 55 Cal.App.5th 787, 798.) "Generally, the trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case. [Citation.] It also has a duty to refrain from giving incorrect instructions or instructions on principles of law that are irrelevant and that would have the effect of confusing the jury or relieving it from making findings on the relevant issues." (*Id*. at p. 799.)

26

### 3. *The jury was improperly instructed regarding conspiracy to commit murder*

Here, the prosecution's theory was that Ruiz and Kic agreed to kill Shuemaker, with Kic supplying Ruiz the gun that he used to shoot Shuemaker. Murder "is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice "may be express or implied." (§ 188, subd. (a).) " 'It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' " (*People v. Swain* (1996) 12 Cal.4th 593, 600 (*Swain*).) "*Implied malice* murder, in contrast to express malice, requires instead an intent to do some act, the natural consequences of which are dangerous to human life." (*Id.* at p. 602.) "[A]ll conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1237.) Because all murder conspiracies are conspiracies to commit first degree murder, a conspiracy conviction "cannot be based on a theory of implied malice." (*Swain*, at p. 607; *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 642 (*Beck and Cruz*) ["Conspiracy to commit murder may be based only on express malice, i.e., an intent to kill."].)

Accordingly, it is improper for a court to cross-reference the murder instructions (CALCRIM No. 520) in the conspiracy instruction (CALCRIM No. 563) when the murder instructions refer to implied malice murder. Referring to implied malice " 'could confuse jurors' " because " 'conspiracy to commit murder, may not be based on a theory of implied malice.' " (*Beck and Cruz, supra*, 8 Cal.5th at p. 642.) When giving the conspiracy instruction, the murder instruction should be modified to delete references to implied malice. (*Ibid.*) Thus, as all parties agree, the instruction for conspiracy to commit murder was erroneous.

We evaluate this error for prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24. (*Beck and Cruz, supra*, 8 Cal.5th at p. 642; *Swain, supra*, 12 Cal.4th at p. 607.) Under this standard, we must reverse the conviction unless after examining the entire cause, including the evidence, and considering all relevant circumstances, it appears

"beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, at p. 24.)

The Attorney General maintains that despite this error the balance of the instructions, the prosecutor's argument, and the jury verdict make clear that the jury in fact found that Ruiz and Kic intended to kill Shuemaker. As to Ruiz, we agree that when taken together, the remaining instructions, the prosecutor's argument, and the jury's verdict, that the jury necessarily found Ruiz guilty of conspiracy to commit murder on a proper theory, i.e., based on express malice or intent to kill. (*Swain*, *supra*, 12 Cal.4th at p. 607.) However, as to Kic, the same considerations lead us to conclude that the jury could have based its conviction for conspiracy to commit murder upon a theory of implied malice.

Here, the jury's findings confirm that Ruiz was found guilty of conspiracy to commit murder based on a theory of express malice. In convicting Ruiz of count 1 of murder in the first degree, the jury was instructed with CALCRIM No. 521, which provided in relevant part: "The defendant is guilty of first degree murder if the People have proved that he or she acted willfully, deliberately, and with premeditation. The defendant acted *willfully if he or she intended to kill*. The defendant acted *deliberately* if he or she carefully weighed the considerations for and against his or her choice and, knowing the consequences, *decided to kill*. The defendant acted with *premeditation* if he or she *decided to kill* before completing the act that caused death." (Italics added.) "[E]xpress malice and an intent unlawfully to kill are one and the same." (*People v. Saille* (1991) 54 Cal.3d 1103, 1114.) Thus, by finding Ruiz guilty of first degree murder, the jury necessarily found that Ruiz acted with express, not implied, malice. In the context of Ruiz's repeated statements of intent to kill Shuemaker, his efforts to find Shuemaker, and the statements of two witnesses who saw Ruiz shoot Shuemaker without provocation, we are convinced beyond a reasonable doubt that the error did not contribute to the verdict obtained.

Turning to Kic, who was found guilty of second degree murder, we cannot say beyond a reasonable doubt that the error did not contribute to her conviction for conspiracy to commit murder. In *Swain*, 12 Cal.4th at page 607, our high court concluded that reversal was required because the verdicts did not disclose whether the jury had relied on an implied malice theory in returning the conviction and because the prosecutor repeatedly had referred to implied malice in her closing arguments.

Likewise here, the prosecutor repeatedly argued to the jury that Kic could be convicted under an implied malice theory. In discussing malice aforethought, the prosecutor reminded the jury that these are two types of malice, implied and express malice. She went on to note, as this applied to Kic, "the way the aiding and abetting and implied malice could interrelate together is when she gave [Ruiz] the gun, knowing what kind of a person he was, that he was a thug, that he threatened people, that he was angry at him, that he had been shamed by him, she knew that giving that kind of a person a loaded gun was . . . an act that was inherently dangerous to life." She later argued that Kic "knew" Ruiz was going to kill Shuemaker and gave him the gun, gave him information, and "she intended to help him do that, and *her mental state was implied malice* to at least shoot him which is an inherently dangerous act and when she recklessly helped him to do it she *acted with implied malice*." (Italics added.) Thus, the prosecutor expressly urged the jury to consider that Kic's actions and mental state, at the very least, constituted something less than express malice, which compounded the court's instructional error.

In addition to the prosecutor's argument, the jury's verdict also suggests that, as to Kic, the instructional error may have allowed the jury to convict her of conspiracy to commit murder on an implied malice theory. In contrast to Ruiz, the jury here found Kic *not* guilty of first degree murder and instead convicted her of second degree murder. Second degree murder may be based on three theories: unpremeditated murder with express malice; implied malice murder; and second degree felony murder. (*Swain*, *supra*,

29

12 Cal.4th at pp. 601-602.) Conspiracy to commit murder requires the specific intent to kill, and cannot be committed if the underlying criminal objective is second degree implied malice murder. (*Id*. at pp. 602-603, 607.) Here, Kic's participation in the murder was not as the actual perpetrator and felony murder was not at issue, leaving implied malice as the only valid theory for a second degree murder conviction. Although the mere existence of inconsistent verdicts does not show that the jury must have been confused (*People v. Lewis* (2001) 25 Cal.4th 610, 655), in light of the clear instructional error, it strongly implies that the jury did not find Kic had the specific intent to kill.

The Attorney General contends that the jury's verdict confirms that the jury found Kic committed conspiracy to commit murder with express malice. He notes that the jury returned a true finding on the enhancement allegation that Kic "furnished and offered to furnish a firearm to another for the purpose[s] of aiding and abetting or enabling that other person to commit a felony" as to count 2, conspiracy to commit murder. The instruction related to this enhancement, CALCRIM No. 3250, required the jury to find that Kic furnished or offered to furnish a firearm "with the specific intent to aid, abet, or enable that person to commit a felony." The Attorney General thus argues that "[s]ince the only felony referenced in the instructions was murder, and since specific intent is an element only of express malice murder," then the jury necessarily found Kic guilty of conspiracy based on an express malice theory.

Based on the totality of the instructions, we find this argument unavailing. First, contrary to the Attorney General's assertions, the instructions also referred to other felonies. In particular, Ruiz was charged in counts 3 and 4 with felony possession of a firearm by a felon and felony possession of ammunition by a prohibited person. Thus, Kic's furnishing of a firearm could also have applied to Ruiz's commission of counts 3 and 4. Second, the instructions were not entirely consistent in describing the type of crime associated with the furnishing enhancement. In describing which crimes applied to which defendants, CALCRIM No. 203 told the jury that Kic was charged with

30

"furnishing and offering to furnish a firearm for the purpose of aiding and abetting *a crime*." (Italics added.) Thus, we cannot say beyond a reasonable doubt that the jury necessarily made a finding that Kic harbored the requisite intent to kill based on the enhancement findings.

We therefore conclude that Kic's conviction for conspiracy to commit murder must be reversed. The instructions permitted the jury to find Kic guilty of conspiracy to commit murder based on something less than express malice. The error was compounded by the prosecutor's argument to the jury that Kic's intent was, at the very least, implied malice. Further, nothing in the verdicts demonstrate that the jury necessarily found Kic harbored the specific intent to kill, especially in light of the jury's verdicts of not guilty for first degree murder and guilty of second degree murder. Thus, the instructional error was not harmless beyond a reasonable doubt and Kic's conviction must be reversed.

### D. *Instructional Error: Lesser Included Offense of Manslaughter*

Kic contends that the trial court erred by not instructing the jury sua sponte on involuntary manslaughter as a lesser-included offense to count 1, murder. Kic also contends that if the issue was waived by failing to request the instruction, defense counsel was prejudicially ineffective for failing to do so.

### 1. *Standard of Review*

"A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence . . . which, if accepted, ' "would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*' [citation]." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.) Thus, to warrant instruction on the lesser offense, substantial evidence must support the conclusion that the defendant committed the lesser included offense and not the greater offense. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196 (*Gonzalez*).)

" ' "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." [Citation.] Rather, substantial evidence

31

must exist to allow a reasonable jury to find that the defendant is guilty of a lesser but not the greater offense. [Citation.] " ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' " ' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 718.) In deciding whether to instruct the jury on a lesser included offense, trial courts must not evaluate the credibility of witnesses and must resolve doubts regarding the sufficiency of evidence in a defendant's favor. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) We review de novo the trial court's decision to instruct on a lesser included offense. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*).)

Involuntary manslaughter is a lesser included offense of murder. (*Gonzalez*, *supra*, 5 Cal.5th at p. 197.) Involuntary manslaughter is an unlawful killing of a human without malice. (§ 192, subd. (b).) By statute, commission of the offense requires (1) "an unlawful act, not amounting to a felony"; or (2) "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) However, courts have defined additional, nonstatutory forms of the offense based on the acts of (3) a noninherently dangerous felony accomplished without due caution and circumspection; or (4) an inherently dangerous assaultive felony. (*Brothers*, *supra*, 236 Cal.App.4th at pp. 31-33.) Involuntary manslaughter requires the absence of malice aforethought and the presence of criminal negligence. (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.) "Accordingly, an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently assaultive felony." (*Brothers*, *supra*, at p. 34.)

2. *The trial court had no sua sponte duty to give an involuntary manslaughter instruction*

In *Brothers*, *supra*, 236 Cal.App.4th at page 34, the defendant beat the victim with a large wooden broom handle, and her accomplices forced a gag down the victim's

throat. A jury acquitted the defendant of murder but convicted her of voluntary manslaughter. (*Id*. at pp. 27-28.) On appeal, the defendant contended that the trial court had a sua sponte duty to instruct the jury on involuntary manslaughter as a lesser included offense to murder, arguing that the instruction was warranted because she testified that she did not know " 'this was going to happen.' " (*Id*. at p. 34.) The Court of Appeal rejected her argument because "intent to kill is an element of express malice, not implied malice." (*Ibid*.) The court found, at a minimum, the defendant acted with implied malice, noting that even crediting her statement that she did not know this was going to happen, "there was simply no evidence from which a reasonable jury could entertain a reasonable doubt that [the defendant] had acted in conscious disregard of the risk her conduct posed to [the victim's] life." (*Ibid*.) Thus, the court concluded that "when, as here, the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter." (*Id*. at p. 35.)

Here, as in *Brothers*, there was no material issue presented as to whether Kic subjectively appreciated the danger to human life her conduct posed. Kic provided Ruiz with the murder weapon along with a bulletproof vest. She also updated Ruiz by text message on Shuemaker's location, suggested ways to lure him out, and helped Ruiz despite Ruiz's numerous statements that he was going to kill Shuemaker. She also reportedly said she wanted to be there when Shuemaker begged for his life.

Kic points to her alleged statements to Ruiz that he should "just shoot [Shuemaker] in the legs" as evidence she acted without malice. Kic also points to her text message to Ruiz telling him that Natividad wanted his gun back, and argues that this text demonstrates that she thought Ruiz would return the gun unfired. This evidence,

33

however, did not constitute substantial evidence that Kic's intent was anything less culpable than implied malice. Kic's suggestion to shoot Shuemaker in the legs came after Ruiz repeatedly stated his intent to shoot and kill Ruiz, and after Kic provided the means and encouragement to do so. Standing by itself, the statement failed to raise a material issue as to whether Kic subjectively appreciated the danger to human life her conduct posed.

As relates to her asking Ruiz to return the gun to Natividad, the statement does not indicate a belief on Kic's part that the gun would not be fired. She stated, "Roommate here, too. Won't leave until he has gun back . . . I just acted like I didn't talk to u . . . so u can decide . . . he has dr [at] 9." At face value, the text message merely relates to Ruiz that Natividad wanted the gun back, which suggests only that Natividad thought that the gun would not be fired. Indeed, Kic's message ultimately told Ruiz, "u can decide" whether to return the gun or not. Rather than suggest no knowledge, this suggests that Kic knew there was a reason the gun should not be returned.

In addition, Kic's instructional error claim nonetheless fails because, even assuming error, any such error was harmless. In non-capital cases, "[t]he trial court's failure to instruct on lesser included offenses . . . of murder with malice aforethought is subject to harmless error review" under the standard of *People v. Watson*, *supra*, 46 Cal.2d 818. (*Gonzalez*, *supra*, 5 Cal.5th at p. 199; *People v. Thomas* (2012) 53 Cal.4th 771, 814.) Under the *Watson* standard, reversal is required only if defendant shows a "different result was reasonably probable" had the jury been instructed on involuntary manslaughter. (*Gonzalez*, at p. 201.) " 'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively*

34

weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Thomas*, at p. 814.)

Here, applying these standards, we conclude that even assuming error there is no reasonable probability it affected the result. As we discussed, there was strong evidence Kic knew of and encouraged Ruiz to kill Shuemaker, or at a minimum she acted in conscious disregard for life because she fully appreciated the risk of arming and supporting Ruiz notwithstanding what she knew about Ruiz's antagonistic relationship with Shuemaker. Based on the evidence presented, the jury was not reasonably likely to have convicted Kic of the lesser offense if instructions on involuntary manslaughter had been given. For the same reason, Kic's ineffective assistance claim also necessarily fails, given that *Watson* error is substantially the same as the prejudice prong of *Strickland v. Washington* (1984) 466 U.S. 668. (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)

### E. Instructional Error: Lesser Included Offense of Manslaughter

Kic argues that the trial court erred by failing to sua sponte instruct the jury on conspiracy to commit assault with a firearm as a lesser-included offense of count 2, conspiracy to commit murder. Because we reverse Kic's conviction for conspiracy to commit murder, we do not address this issue.

### F. Instructional Error: Voluntary Intoxication

Kic contends that the trial court erred by not instructing the jury on voluntary intoxication.

### 1. Background

During the jury instruction conference, the trial court granted Ruiz's defense counsel's request that the jury be given CALCRIM No. 625 (voluntary intoxication: effects on homicide crimes) as to Ruiz. Counsel noted that Ruiz testified that he used methamphetamine before he shot Shuemaker. Although the prosecutor noted there was very little evidence of Ruiz's methamphetamine use, as most of it had been stricken, the

prosecutor agreed it "may just be easier to include it" with the jury instructions. The court concluded that there likely was not "enough to support it," but agreed with the prosecutor that it was safer to give it. Consistent with its ruling, the trial court instructed the jury pursuant to CALCRIM No. 625.

### 2. *Standard of Review*

Evidence of voluntary intoxication is admissible not to negate the capacity to form any mental state for a charged crime but "solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b); *People v. Berg* (2018) 23 Cal.App.5th 959, 966.) A trial court has no duty to instruct sua sponte on voluntary intoxication. (*People v. Saille*, *supra*, 54 Cal.3d at p. 1120.) However, a defendant may request an instruction on voluntary intoxication as a " 'pinpoint' " instruction. (*Ibid.*)

### 3. *Kic forfeited any argument that the trial court erred by not giving the jury a voluntary intoxication instruction as to her*

Because Kic did not request an instruction on voluntary intoxication, and because the trial court had no duty to sua sponte instruct on the pinpoint instruction, her claim is forfeited. Kic attempts to avoid forfeiture by arguing instead that the trial court erred by limiting the voluntary intoxication instruction to Ruiz. Kic references the general proposition that when a trial court decides to give an instruction, it must do so correctly. She asserts that it was reasonably likely the jury understood the instruction, stating it applied to Ruiz, as precluding the jury from considering evidence of Kic's own voluntary intoxication. However, this claim necessarily fails, as there was nothing inherently erroneous about the court's voluntary intoxication instruction *in connection with* Ruiz. In all the cases cited by Kic, in which the accuracy of the instruction was at issue, the defendant *requested* the instruction and then later challenged the accuracy of the

36

instruction. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 186; *People v. Covarrubias* (2016) 1 Cal.5th 838, 897, 895.)

Kic also attempts to avoid forfeiture by arguing that her trial counsel was ineffective for failing to request CALCRIM No. 625, especially after it was requested by Ruiz's attorney. To establish ineffective assistance of counsel, the defendant bears the burden of showing trial counsel's performance was deficient, meaning counsel's performance "fell below an objective standard of reasonableness" in light of the prevailing professional norms. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 688.) " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) Second, the defendant must show the asserted deficiency in counsel's performance resulted in prejudice, that is, a " ' "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*Id.* at p. 955.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

The Attorney General suggests "there was a legitimate tactical reason for counsel's silence, namely an instruction on voluntary intoxication would have been inconsistent with Kic's defense." We agree. During closing arguments, her trial counsel argued that Kic was not involved in the conspiracy, and in fact, there was no conspiracy. Counsel suggested, at best, Kic was guilty of taking "steps to help [Ruiz] get away" after the killing. Counsel could have rationally concluded it was not worth arguing, in the

alternative, that Kic did in fact help Ruiz but was too intoxicated to form the requisite intent. Accordingly, we must reject Kic's claim of ineffective assistance of counsel on direct appeal.

### G. Cumulative Error

Kic claims that even if harmless considered alone, the cumulative effect of the asserted instructional errors requires reversal.

"Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

In this case, we found that there was prejudicial error with respect to count 2, conspiracy to commit murder, but found Kic's other remaining claims of error unavailing. As there are no other errors to cumulate, we must reject Kic's cumulative error argument.

### H. Section 654

Ruiz contends that his sentence for conspiracy to commit murder and for possession of a firearm by a felon should be stayed pursuant to section 654. The Attorney General concedes Ruiz is correct as to the conspiracy count, but maintains that consecutive sentencing was appropriate for the possession charge.

Kic separately argues that the court should have stayed her consecutive three-year term for furnishing a firearm to aid and abet a felony. Because Kic will necessarily be resentenced, we do not address this sentencing claim.

### 1. Conspiracy to commit murder (*Ruiz*)

### a. Background

At Ruiz's sentencing, the trial court stated, with respect to count 1 and count 2: "As to the life terms with respect to Count 1 [murder], the Court will impose the sentence of life in prison. Pursuant to Penal Code section 12022.53(d), the enhancement, the

Court will impose the term of 25 years to life. [¶] With respect to count 2 [conspiracy][,] the Court will impose the term of 25 years to life. The [C]ourt will stay that term pursuant to Penal Code section 654. The Court will order that those terms are to be served consecutively." With respect to counts 3 and 4, the court designated count 3 as the principal term and selected the aggravated term of three years. For count 4, the court also selected the aggravated term of three years and then stayed it pursuant to section 654. The court stated the total sentence "for Mr. Ruiz is 53 years plus life in prison."

As relevant here, the abstract of judgment states that the term for the count 1, murder, was "life with the possibility of parole," the term for count 2, conspiracy to commit murder, was 25 years to life, and a consecutive term of 25 years to life for the firearm enhancement for count 1.

### b. *The abstract of judgment must be corrected*

The parties agree that the abstract of judgment, as to Ruiz, does not reflect the trial court's oral pronouncement at sentencing. It appears that the trial court intended to impose a 25-year-to-life term on the murder charge, a consecutive 25-year-to-life term for the firearm enhancement, and to impose and stay sentence on the conspiracy count. This would be the appropriate sentence, too, given that the object of the conspiracy and the underlying crime were both the murder of Shuemaker. In this instance, where the object of the conspiracy as found by the jury was no broader than the underlying crime, sentence on the conspiracy charge must be stayed under section 654. (*People v. Dalton* (2019) 7 Cal.5th 166, 247; *People v. Lewis* (2008) 43 Cal.4th 415, 539.)

We will direct the trial court to correct the abstract of judgment on remand.

### 2. *Possession of a firearm by a felon* (*Ruiz*)

As noted, the trial court also sentenced Ruiz to a consecutive term on count 3, possession of a firearm by felon. Ruiz contends that his possession of a firearm was "inextricably intertwined with the murder, and thus part of an indivisible course of

39

conduct." He argues that since he acquired the gun for the sole purpose of shooting Shuemaker, the sentence for count 3 should have been stayed under section 654.

### a. *Standard of Review*

Under section 654, as it read at the time of Ruiz's sentencing, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).)[9] The statute "precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "The court's findings may be either express or implied from the court's ruling. [Citation.] In the absence of any reference to . . . section 654 during sentencing, the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective." (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626.)

---

[9] Section 654, subdivision (a) now provides, "[a]n act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (Italics added.)

40

The implied finding "must be sustained on appeal if supported by substantial evidence." (*People v. Osband* (1996) 13 Cal.4th 622, 730.) In applying this standard, we "review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*Jones*, *supra*, at p. 1143.)

### b. Substantial evidence supports the trial court's implied finding the crime of being a felon in possession of a firearm was part of a divisible course of conduct

In the context of a conviction for possession of a prohibited weapon, " 'where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the [weapon] has been held to be improper where it is the lesser offense.' " (*People v. Bradford* (1976) 17 Cal.3d 8, 22 (*Bradford*).) "Applying this rule, courts have determined that section 654 applies where the defendant obtained the prohibited weapon *during* the assault in which he used the weapon. [Citations.] However, section 654 has been found not to apply when the weapon possession preceded the assault." (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1217.)

Here, the undisputed evidence reflected that Ruiz's possession of the firearm *preceded* Shuemaker's killing. Indeed, at a minimum and according to his own testimony, the evidence showed that Ruiz obtained Natividad's gun well before he shot Shuemaker, he showed off the weapon at Michael's and Angelic's tent, and possessed it while selling drugs. Based on this evidence, the trial court could reasonably conclude that Ruiz's possession of the firearm was " 'distinctly antecedent and separate from' " the offense of murder (*Bradford*, *supra*, 17 Cal.3d at p. 22), and it could properly impose separate punishment for those offenses without running afoul of section 654.

Citing *People v. Cruz* (1978) 83 Cal.App.3d 308 (*Cruz*), *People v. Jurado* (1972) 25 Cal.App.3d 1027 (*Jurado*), and *People v. Kane* (1985) 165 Cal.App.3d 480 (*Kane*), Ruiz argues that multiple punishment is barred because his only intent in having the gun was to use it to shoot Shuemaker. We disagree, as these cases are distinguishable.

In *Cruz*, the defendant attempted to gain entry to a bar and was denied. Three to five minutes later, the defendant returned with a handgun and fired it, hitting multiple people. (*Cruz*, *supra*, 83 Cal.App.3d at p. 314.) The appellate court found that the defendant's possession of a handgun was not " 'antecedent and separate' " from his use of the weapon in the assault because there was no evidence of him possessing the handgun prior to the assault. (*Id.* at p. 333.) In *Jurado*, the defendant was convicted of first degree burglary and carrying a concealed weapon. (*Jurado*, *supra*, 25 Cal.App.3d at p. 1029.) The appellate court determined he could not be separately punished because the possession charge was the sole basis for elevating the offense to burglary in the first degree, and because there was no evidence the defendant possessed the gun prior to the burglary. (*Id.* at p. 1033.) Finally, in *Kane*, the defendant and the victim argued, leading to a fistfight. The victim decided to leave, went to his car, and got in. A brief confrontation with the defendant occurred, and at one point, the defendant fired a gun at the victim's car. (*Kane*, *supra*, 165 Cal.App.3d at p. 484.) The defendant was convicted of assault with a deadly weapon, discharging a firearm at an occupied vehicle, and possession of a firearm by a felon. (*Id.* at p. 483.) The defendant argued on appeal that punishment should have been stayed for discharging a firearm and possession. The Attorney General conceded error, and the appellate court agreed, concluding that because the "[d]efendant possessed the firearm, fired it at [the victim], and hit the [car] in an indivisible course of conduct," section 654 applied. (*Kane*, at p. 488.)

Here, in contrast to *Cruz* and *Jurado*, there was ample evidence that Ruiz possessed the firearm prior to killing Shuemaker. Moreover, unlike *Kane*, Ruiz's possession was not contemporaneous to the shooting. He obtained the weapon hours in

advance, had sufficient time to show it off, and then later used it to shoot Shuemaker. Under these circumstances, the trial court's implied findings are supported by substantial evidence and therefore section 654 did not bar multiple punishments.

### I. *Senate Bill 567 and Assembly Bill 518*

In a second supplemental brief, Kic contends that her case should be remanded for resentencing in light of Senate Bill 567 and Assembly Bill 518, which she contends are ameliorative and apply retroactively. Because Kic will necessarily be resentenced on remand, we need not address these arguments on appeal.

## IV. DISPOSITION

As to defendant Kic, the judgment of conviction for count 2, conspiracy to commit murder, is reversed. The sentence is vacated in its entirety. The prosecution shall, within 30 days of the issuance of remittitur, file a written election to either retry Kic for conspiracy to commit murder or forego a retrial. Upon the conclusion of the retrial or the prosecution's decision not to retry Kic, the trial court shall resentence Kic in accordance with current law. Kic's remaining conviction for second degree murder and related enhancements are affirmed.

As to defendant Ruiz, the judgment is reversed. The cause is remanded with directions to correct the abstract of judgment to reflect the court's oral pronouncement at sentencing. Ruiz's convictions are otherwise affirmed.

_____
Wilson, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P.J.



_____
Danner, J.



People v Kic et al.
H047226